# In the United States Court of Federal Claims

## BID PROTEST

<table>
<tr><td>

VECTRUS SYSTEMS CORPORATION,

          Plaintiff,

v.

THE UNITED STATES OF AMERICA,

          Defendant,

and

KELLOGG, BROWN & ROOT
SERVICES, INC.,

          Defendant-Intervenor.

</td><td>

)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)

</td><td>

No. 20-2053C<br>(Filed Under Seal: April 23, 2021 |<br>Reissued: June 1, 2021)

</td></tr>
</table>

*Kevin P. Mullen*, *Sandeep N. Nandivada*, *Caitlin. A. Crujido*, *Lyle F. Hedgecock*, and *Victoria D. Angle*, Morrison & Foerster LLP, Washington, DC, for Plaintiff.

*Anna Bondurant Eley*, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, for Defendant, with whom were, *Douglas K. Mickle*, Assistant Director, *Robert E. Kirschman, Jr.*, Director, and *Brian M. Boynton*, Acting Assistant Attorney General. *Jason R. Smith*, AF/JACQ, Joint Base Andrews, MD, Of Counsel.

*Seth H. Locke*, *Alexander O. Canizares*, *Brenna D. Duncan*, *Julia M. Fox*, and *Paul M. Korol*, Perkins Coie LLP, Washington DC, for Defendant-Intervenor.

## **OPINION AND ORDER**[*]

---

[*] This Opinion was originally issued under seal and the parties were given the opportunity to request redactions. In response, both Vectrus and KBR asked for redactions of certain negative comments about their past performance that the Court discussed in addressing Vectrus's disparate treatment claim. In addition, KBR asks the Court to redact the employee tenure estimates contained in its proposal on the grounds that they "constitute underlying cost elements of KBR's total price that have not been previously disclosed." ECF No. 58 at 2.

KAPLAN, Chief Judge.

The plaintiff, Vectrus Systems Corporation ("Vectrus"), is the incumbent contractor providing day-to-day base maintenance services at United States Air Force ("Air Force" or the "agency") installations in Turkey and Spain. Compl. ¶ 7, ECF No. 1. It filed this post-award bid protest to challenge the Air Force's decision to award the successor USAFE-AFAFRICA Base Operations Support ("UABOS") contract to defendant-intervenor, Kellogg, Brown & Root Services, Inc. ("KBR").

On April 12, 2021, the Court issued a short Order denying Vectrus' motion for judgment on the administrative record and granting the government's and KBR's cross-motions for judgment on the administrative record. ECF No. 53. What follows is a more detailed explanation of the Court's reasoning.

## BACKGROUND

### I.    The Solicitation

On June 11, 2019, the Air Force issued RFP No. FA5641-19-R-A001 (the "Solicitation"). Admin. R. ("AR") Tab 39 (RFP), ECF No. 28. It requested proposals for an indefinite delivery/indefinite quantity contract to supply base operating services in support of United States

---

The court may restrict public access to records which contain "business information that might harm a litigant's competitive standing," Nixon v. Warner Commc'ns, Inc., 435 U.S. 589, 598 (1978). But that authority to shield parts of its Opinion from the public view is subject to the "strong presumption in favor of a common law right of public access to court proceedings." In re Violation of Rule 28(D), 635 F.3d 1352, 1356 (Fed. Cir. 2011).

In the Court's view, KBR's request that its employee tenure estimates be redacted is justified. The estimates constitute proprietary information in which there is little public interest and whose disclosure might affect KBR's competitive standing in any follow-on procurement to supply base operating services to the U.S. Air Forces in Europe.

Neither KBR nor Vectrus, however, has persuaded the Court that it would be appropriate to redact the negative past performance information that the Court discussed in its opinion. "The purpose of redaction is to safeguard the competitive process, not to withhold information that a party frowns on making public." Linc Gov't Servs., LLC v. United States, 96 Fed. Cl. 672, 723 (2010); see also AmerGen Energy Co., LLC by & through Exelon Generation Co., LLC v. United States, 115 Fed. Cl. 132, 140 (2014) (requiring a party to offer "compelling reasons to overcome the strong presumption in favor of access with respect to the information identified in its motion"). Further, were the Court to redact all of the negative past performance information as KBR and Vectrus request, it would be impossible for the reader to understand the basis for its disposition of Vectrus's primary claim—which was that the agency engaged in disparate treatment when it evaluated and compared Vectrus's past performance to that of KBR. The Court is therefore reissuing its Opinion with only the tenure estimates redacted.

Air Forces in Europe ("USAFE") and United States Air Forces in Africa ("AFAFRICA") ("UABOS Contract"). Id. at 2100. It also requested proposals for up to two task orders to provide such services in Spain and Turkey. Id. at 2162.

Under the Solicitation, the agency would award the UABOS Contract to the offeror whose proposal was technically acceptable and presented the best value to the government based on an integrated assessment of past performance and price. Id. The Solicitation provided that "[t]radeoffs may be made between past performance and cost/price, with past performance considered significantly more important than cost/price, although cost/price remains an important consideration in the evaluation." Id.

### A.       Past Performance Evaluation Criteria

Under the Solicitation, offerors were required to submit between two and four examples of "recent contracts and[/]or Task Orders considered most relevant in demonstrating the ability to perform [UABOS] Services." Id. at 2150. In addition, the agency retained the discretion to secure other past performance information from various governmental and other sources including, among others, the Contractor Performance Assessment Report System (i.e., the source of Contractor Performance Assessment Reports ("CPARs")). Id. at 2163. The Air Force would use the information to "determine [its] confidence in each offeror's probability of successfully performing as proposed," which would be based on its independent evaluation "of the recency, relevancy, and quality assessments of the contracts evaluated." Id. at 2163–64; see also AR Tab 67 at 3088 (explaining that the government's confidence assessment would be "based on a demonstrated record of performance").

The Solicitation explained that the agency would deem a reference sufficiency recent to be considered if it involved work performed during the preceding five years. AR Tab 39 at 2164. A reference would be found relevant if it was "similar [in] magnitude or complexity" to the UABOS Contract and had "a minimum annual value of $25" million. Id. The Solicitation stated that the agency was "not bound by the offeror's opinion of relevancy," and would "perform an independent determination of relevancy of the data provided or obtained" with respect to past performance. Id.

The Solicitation further provided that each reference would be rated either "Very Relevant," "Relevant," "Somewhat Relevant," or "Not Relevant," based on the standards set forth in the table below. Id.

| VERY RELEVANT | Past performance effort involved in accomplishing Civil Engineering, Logistics and Force Support services for work performed on contracts or task orders $50M or greater annually. Offeror's efforts shall demonstrate the ability to execute work for the DoD in multiple locations simultaneously within Europe or Africa. |
|---|---|
| RELEVANT | Past performance effort involved in accomplishing Civil Engineering and either Logistics or Force Support services for work performed on contracts or task orders between $25M to $49.9M annually. Offeror's |

|  | efforts shall demonstrate the ability to perform work for the DoD at OCONUS (excluding Alaska and Hawaii) locations. |
|---|---|
| **SOMEWHAT RELEVANT** | Past performance effort involved in accomplishing Civil Engineering and either Logistics or Force Support services for work performed on contracts or task orders between $15M and $24.9M annually. Offeror's efforts shall demonstrate the ability to perform work for the DoD or non-DOD at CONUS or OCONUS locations. |
| **NOT RELEVANT** | Past performance effort did not involve accomplishing Civil Engineering and either Logistics or Force Support services work performed on contracts less than $15M annually. Offeror's efforts did not demonstrate past performance for work for DoD at CONUS or OCONUS locations. |

Id.

The Solicitation also advised that offerors would have the opportunity to "address adverse past performance information." Id. at 2163. In addition—with respect to any adverse performance history—the Air Force would conduct an examination "to ensure that corrective measures have been implemented," and would assess recent contracts for "the number and severity of the problems, the appropriateness and/or effectiveness of any corrective actions taken (not just planned or promised), and the overall work record." Id.

The Source Selection Evaluation Board ("SSEB") would assign each reference a quality rating based on the definitions established in the FAR, as follows:

| **Exceptional** | Performance meets contractual requirements and exceeds many to the Government's benefit. The contractual performance of the element or sub-element being evaluated was accomplished with few minor problems for which corrective actions taken by the contractor were highly effective |
|---|---|
| **Very Good** | Performance meets contractual requirements and exceeds some to the Government's benefit. The contractual performance of the element or sub-element being evaluated was accomplished with some minor problems for which corrective actions taken by the contractor were effective |
| **Satisfactory** | Performance meets contractual requirements. The contractual performance of the element or sub-element contains some minor problems for which corrective actions taken by the contractor appear or were satisfactory |
| **Marginal** | Performance does not meet some contractual requirements. The contractual performance of the element or sub-element being evaluated reflects a serious problem for which the contractor has not yet identified corrective actions. The contractor's proposed actions appear only marginally effective or were not fully implemented |
| **Unsatisfactory** | Performance does not meet most contractual requirements and recovery is not likely in a timely manner. The contractual performance of the element or sub-element contains a serious problem(s) for which the contractor's corrective actions appear or were ineffective |

See FAR 42.1503: Table 42-1—Evaluation Ratings Definitions.

Finally, the SSEB would assign each offeror one of the following performance confidence assessment ratings for the past performance category based on "the recency, relevancy, and quality assessments of the contracts evaluated." AR Tab 39 at 2164.

| Substantial Confidence | Based on the offeror's recent/relevant performance record, the Government has a high expectation that the offeror will successfully perform the required effort. |
|---|---|
| Satisfactory Confidence | Based on the offeror's recent/relevant performance record, the Government has a reasonable expectation that the offeror will successfully perform the required effort. |
| Neutral Confidence | No recent/relevant performance record is available or the offeror's performance record is so sparse that no meaningful confidence assessment rating can be reasonably assigned. The offeror may not be evaluated favorably or unfavorably on the factor of past performance. |
| Limited Confidence | Based on the offeror's recent/relevant performance record, the Government has a low expectation that the offeror will successfully perform the required effort. |
| No Confidence | Based on the offeror's recent/relevant performance record, the Government has no expectation that the offeror will be able to successfully perform the required effort. |

## B.    Price

The Solicitation explained that the agency would assess each offeror's price proposal for its "completeness, reasonableness, balance and realism." Id. A price would be considered reasonable where it "represent[ed] a price to the Government that a prudent person would pay when consideration is given to prices in the market." Id. at 2165.

The agency would assess price reasonableness on the basis of a proposal's "Total Evaluated Price" ("TEP"). Id. Further, the price analysis would be "conducted with the expectation of adequate price competition and w[ould] rely on the techniques and procedures described under FAR 15.404-1(b) as the primary means of assessing proposal reasonableness." Id. at 2164; see also FAR 15.404-1(b)(2) (detailing permissible methods of price analysis); FAR 15.403-1(c)(1)(i) (detailing the circumstances under which there is adequate price competition for the agency to conduct a price analysis).

## II.    The Past Performance Evaluations

The Air Force received three proposals in response to the Solicitation, including those submitted by KBR and Vectrus. AR Tab 64 at 2957–58.

### A.    The SSEB's Evaluation of KBR's Past Performance

KBR submitted four past performance references with its proposal, and the SSEB identified an additional two it considered sufficiently recent and relevant to be considered in the

past performance assessment. AR Tab 64 at 2970. The SSEB determined that three of the references were "Very Relevant." Id. at 2971–74. As set forth in the table below, for those three "Very Relevant" references, the SSEB assigned a quality rating of "Very Good" for the Turkey Spain Base Maintenance Contract ("TSBMC") I (the precursor to Vectrus' incumbent contract, TSBMC II), "Satisfactory" for the Djibouti Base Operations Support Services III (the "Djibouti Contract") and "Exceptional" for the Logistics Civil Augmentation Program IV, Task Order ("TO") 0010 European Command ("LOGCAP IV"). Id. Of KBR's other three references, two were deemed "Relevant," and one "Somewhat Relevant." Id. at 2974–77. The SSEB rated performance on all three of these references "Very Good." Id.

| Offeror B (KBR) | | |
|---|---|---|
| Reference | Relevancy | Quality |
| LOGCAP IV TO 0010 | Very Relevant | Exceptional |
| TSBMC I | Very Relevant | Very Good |
| Djibouti Base Operations Support Services III | Very Relevant | Satisfactory |
| LOGCAP IV, TO 0009 | Relevant | Very Good |
| Isa Air Base Base Operating Support Contract | Relevant | Very Good |
| Kosovo Support Services | Somewhat Relevant | Very Good |

Id. at 2971–77.

Overall, KBR earned a "Substantial Confidence" rating from the SSEB, reflecting the government's "high expectation that [the offeror] will successfully perform the required effort." Id. at 2977; see also AR Tab 39 at 2164 (describing the cumulative ratings system).

### B.    Vectrus' Past Performance

Vectrus submitted four references with its proposal, and the SSEB identified an additional three as sufficiently recent and relevant for inclusion in the past performance assessment. AR Tab 64 at 2983–89. As shown in the table below, the SSEB determined that only one of Vectrus' references—the incumbent contract, TSBMC II—was "Very Relevant." Id. at 2983. The SSEB rated Vectrus' performance on that contract as "Satisfactory." Id. at 2983–84. The SSEB deemed Vectrus' Thule Base Maintenance Contract (the "Thule Contract") "Relevant" rather than "Very Relevant" because—although the annual contract value was $67 million—the agency found that it did not involve work executed "in multiple locations simultaneously within Europe or Africa, as is required to achieve a rating of Very Relevant." Id. at 2984–85. The Thule Contract received a "Very Good" performance quality assessment from the SSEB "based on the mixture of Satisfactory and Exceptional CPARS ratings and corresponding write ups." Id. at 2985. Of its other four references, two were also deemed "Relevant," and were rated "Exceptional" and "Very Good," and two were deemed "Somewhat Relevant," and both were rated "Satisfactory." Id. at 2985–89.

| Offeror C (Vectrus) | | |
|---|---|---|
| Reference | Relevancy | Quality |
| TSBMC II | Very Relevant | Satisfactory |

| Kuwait – Base Operations and Security Support | Relevant | Exceptional |
|---|---|---|
| Thule Contract | Relevant | Very Good |
| Qatar – Base Operations Support Services | Relevant | Very Good |
| Keesler AFB BOS Contract | Somewhat Relevant | Satisfactory |
| Maxwell Air Force Base – Base Operations Services Support Contract | Somewhat Relevant | Satisfactory |

Id. at 2983–89.

The SSEB gave Vectrus an overall "Satisfactory Confidence" performance confidence assessment rating, reflecting its "reasonable expectation that the offeror will successfully perform the required effort." Id. at 2991–93. The SSEB acknowledged that Vectrus' relevant references had received one "Exceptional" and two "Very Good" ratings, and that the Past Performance Team had been "positively impressed by the CPARs" on the Thule Contract. Id. at 2991. It further noted Vectrus' "noteworthy actions to fulfill mission requirements" of TSBMC II, including its "highly commendable" provision of "exceptional quality of services in a highly stressful environment" which "provided significant benefit to the Government in a time of political unrest." Id. at 2991–92.

Nonetheless, the SSEB explained, its analysis "highlighted issues with [Vectrus'] cost control and business management" including "invoice delays and discrepancies" for TSBMC II, which had "resulted in the government missing milestone deadlines and ha[d] become administratively burdensome." Id. at 2992. The SSEB also expressed discomfort regarding Vectrus' "ability to responsibly manage Government funds" and "provide complete and accurate invoices, proposals, and overall program cost data." Id. It explained that these "discrepancies," and significant periods of regular vacancies in "mandatory positions that are critical to mission support," had prompted it to be "concerned that because of this management approach, [the government was] at risk of receiving a degradation of mission critical service." Id. at 2991.

The SSEB concluded that Vectrus' "documented performance issues in cost control and management point to ineffective internal processes and [are] not conducive to the proper and successful performance of" the UABOS Contract. Id. at 2992. It explained that Vectrus had not yet completed the corrective actions it had proposed in response to two evaluation notices ("ENs") the Air Force had issued to it, raising concerns that the contractor would be "unable to follow-through on proposed corrective actions thus negatively impacting mission capability." Id. at 2993. It also observed that Vectrus had "neither posed questions, nor challenged [its] Past Performance Confidence rating" in a December 12, 2019 meeting regarding Vectrus' Initial Evaluation Briefing. Id.

## III.    Price Evaluations

To determine price reasonableness, the agency compared the TEP of each proposal against the average of the TEPs of all technically acceptable proposals. AR Tab 58 at 2547. A price would be deemed "reasonable" if it was within twenty percent of the average. Id.; see also AR Tab 1 at 13 (explaining that twenty percent is a metric determined by Air Force custom and Air Force Installation Contracting Center pricing support recommendations and thus a

commonly utilized benchmark). In addition, the agency also compared each offeror's TEP against the government TEP of $554,530,355. AR Tab 58 at 2576.

Applying these criteria, the SSEB concluded that both offerors' price proposals were "[c]omplete, [r]easonable, [b]alanced, and [r]ealistic." Id. at 2586. The SSEB compared KBR's TEP to both the average TEP of all proposals and to the government TEP. Id. at 2546. KBR's TEP ($557,498,425) was 5.2% higher than the average TEP of all proposals (and thus within the twenty-percent threshold specified in the Solicitation) and only 0.54% higher than the government TEP. Id. at 2583. Vectrus' TEP ($484,594,108) was 8.56% lower than the average and 12.61% lower than the government TEP. Id. at 2584.

## IV.   Award Decision

Based on the analysis contained in the SSEB Report, the agency's Source Selection Advisory Council ("SSAC") recommended that the agency award the UABOS Contract to KBR. AR Tab 66 (August 21, 2020 SSAC Comparative Analysis Report) at 3084. It explained that the agency's higher level of confidence in KBR's ability to perform the contract was worth the tradeoff of a higher price. Id.

In a memorandum dated August 21, 2020, the Source Selection Authority ("SSA") agreed with the SSAC's recommendation and directed award of the UABOS Contract to KBR. AR Tab 67 (Source Selection Decision Document) at 3090. The SSA explained that "successful performance of the UABOS contract will play a crucial role in the successful completion of Air Force and [Department of Defense ("DoD")] missions within the USAFE-AFAFRICA [area of responsibility]." Id. at 3091. "As such," she noted, "it requires a contract[or] with a record of strong past performance supporting Air Force and DoD base operations internationally." Id.

Vectrus, she explained, had received a "Satisfactory" rating on its only "Very Relevant" reference (the incumbent contract, TSBMC II), and so its "complete past performance record did not rise to the level of excellence required to be assigned a Substantial Confidence assessment." Id. at 3092. Citing Vectrus' failure to perform aircraft arresting barrier maintenance—i.e., a problem which had prompted the SSEB to issue an EN to Vectrus—the SSA observed that "the Government was forced to temporarily deploy a Government team from Germany to accomplish this mission critical maintenance." Id. at 3090. She also pointed to Vectrus' failure to maintain the TSMBC II Project Management Database as an example of "why the Government [would be] willing to pay more for a higher past performance confidence rating." Id. Given that "the TSBMC II performance represents the most similar performance to the solicited requirement[s]," she explained, she had "only a reasonable expectation that Vectrus would be able to successfully perform the UABOS effort." Id. at 3093.

By contrast, the SSA observed, KBR had a "record of successful performance on contracts of the magnitude and complexity of the UABOS effort across the range of mission areas required." Id. Its performance history "documented solid trends of exceptional and very good past performance of base operations support type services performed in the USAFE-AFAFRICA [areas of responsibility]," which instilled in the SSA "confidence in KBR's ability to perform at the task order level," a "confidence [which was] critical when considering the

importance of maintaining combat-ready forces throughout the USAFE-AFAFRICA [area of responsibility], on which the Air Force is dependent in carrying out its mission." Id. at 3092–93.

The SSA acknowledged that KBR's proposal represented a 15% price premium over Vectrus' proposal. Id. at 3093. She opined, however, that this was "a reasonable trade to award to an Offeror with a high expectation of successful performance," id. at 3091, in light of the documented and "ongoing concerns with invoicing, staffing, cost control, and business management" in the performance history of Vectrus' incumbent contract, id. at 3093.

In short, the SSA determined that "on balance, the significantly more important Substantial Confidence assessment of KBR's past performance outweighs the lower price by Vectrus." Id. She thus "determine[d it] to be in the best interest of the Government to pay the 15% cost premium for KBR," AR Tab 1 at 26, and concluded that KBR, "who offers an acceptable technical approach, with Substantial Confidence rating in Past Performance, at a fair and reasonable price of $557,498,425, represent[ed] the best overall value to the Government," AR Tab 66 at 3084.

## V.     Vectrus' GAO Protest

On August 26, 2020, the Air Force informed Vectrus that it had awarded the UABOS Contract to KBR. See AR Tab 68 (Unsuccessful Offeror Notice to Vectrus). On September 16, 2020, Vectrus filed a protest with the Government Accountability Office ("GAO"), challenging the Air Force's award decision and alleging that its own proposal represented the best value to the government. AR Tab 72 (Vectrus GAO Protest B-419143). GAO rejected Vectrus' protest on December 23, 2020, concluding that "the SSA's best-value tradeoff decision was based on a detailed comparison of the offeror's past performance records," and that "the agency's selection decision had a reasonable basis and was properly documented." AR Tab 129 (GAO Decision) at 4845–46, ECF No. 30-2.

## VI.    This Action

Vectrus filed a complaint in this court on December 30, 2020, ECF No. 1, and the same day moved for a temporary restraining order and a preliminary injunction, ECF No. 4. The Court granted KBR's motion to intervene on December 31, ECF No. 13, and heard argument on Vectrus' motion on Monday, January 4, 2021 via telephonic status conference. ECF No. 25. At the conclusion of argument, the Court denied Vectrus' motion, and issued a more detailed explanation of its decision shortly thereafter. ECF No. 29.

The government filed the administrative record on January 13, ECF No. 28, and a motion to complete the administrative record on January 22, ECF No. 30. Vectrus filed its motion for judgment on the administrative record on January 27, ECF No. 31, and the government and intervenor filed their separate cross-motions on February 10, 2021, ECF Nos. 35 and 36. Oral argument was held on April 7, 2021 via videoconference.

On April 12, 2021, the Court issued an Order denying Vectrus' motion for judgment on the administrative record and granting the government's and KBR's motions and directing the

entry of judgment. ECF No. 53. In the Order, the Court explained that Vectrus had failed to show that the decision to award the contract to KBR was arbitrary, capricious, an abuse of discretion, or contrary to law. It explained that Vectrus' contentions that the agency's evaluation of the offerors' past performance references reflects disparate treatment and that one of Vectrus' past performance references should have been rated as "Very Relevant" lacked merit. Id. at 2. Further, it found generally unavailing Vectrus' challenge to the agency's price reasonableness determination and rejected its argument that the agency's best-value determination was inconsistent with the criteria in the Solicitation or with law. Id.

## DISCUSSION

### I.      Subject-Matter Jurisdiction

The Court of Federal Claims has jurisdiction over bid protests in accordance with the Tucker Act, 28 U.S.C. § 1491(b). Specifically, the Court has the authority "to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." Id. § 1491(b)(1); see also Sys. Application & Techs., Inc. v. United States, 691 F.3d 1374, 1380–81 (Fed. Cir. 2012) (observing that § 1491(b)(1) "grants jurisdiction over objections to a solicitation, objections to a proposed award, objections to an award, and objections related to a statutory or regulatory violation so long as these objections are in connection with a procurement or proposed procurement").

For standing to bring a bid protest under § 1491(b)(1), a plaintiff must be an "interested party," i.e., "an actual or prospective bidder" who possesses a "direct economic interest" in the procurement. CliniComp Int'l, Inc. v. United States, 904 F.3d 1353, 1358 (Fed. Cir. 2018) (quoting Digitalis Educ. Sols., Inc. v. United States, 664 F.3d 1380, 1384 (Fed. Cir. 2012)); see also Info. Tech. & Applications Corp. v. United States, 316 F.3d 1312, 1319 (Fed. Cir. 2003). An actual or prospective offeror has a direct economic interest if it suffered a competitive injury or prejudice as a result of an alleged error in the procurement process. Myers Investigative & Sec. Servs., Inc. v. United States, 275 F.3d 1366, 1370 (Fed. Cir. 2002) (holding that "prejudice (or injury) is a necessary element of standing"); see also Weeks Marine, Inc. v. United States, 575 F.3d 1352, 1359 (Fed. Cir. 2009).

In post-award protests, like this one, a plaintiff may demonstrate competitive injury or prejudice by showing that it would have had a "substantial chance" of winning the award "but for the alleged error in the procurement process." Weeks Marine, Inc., 575 F.3d at 1359 (quoting Info. Tech., 316 F.3d at 1319). Vectrus meets this standard. It was next-in-line for the contract award after KBR. Given its lower price, absent the allegedly erroneous determinations challenged in this bid protest, Vectrus would have had a substantial chance of receiving the award. Accordingly, Vectrus is an interested party and the Court has subject-matter jurisdiction over its claims.

## II.      Motions for Judgment on the Administrative Record

This Court reviews agency procurement decisions on the basis of the administrative record pursuant to Rule 52.1 of the Rules of the Court of Federal Claims ("RCFC"). See Bannum, Inc. v. United States, 404 F.3d 1346, 1353–54 (Fed. Cir. 2005). The court makes "factual findings under RCFC [52.1] from the record evidence as if it were conducting a trial on the record." Id. at 1357. Thus, "resolution of a motion respecting the administrative record is akin to an expedited trial on the paper record, and the Court must make fact findings where necessary." Baird v. United States, 77 Fed. Cl. 114, 116 (2007). The Court's inquiry is "whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." A&D Fire Prot., Inc. v. United States, 72 Fed. Cl. 126, 131 (2006). Unlike a summary judgment proceeding, genuine issues of material fact will not foreclose judgment on the administrative record. Bannum, 404 F.3d at 1356.

## III.     Scope of Review of Procurement Decisions

Procurement decisions are reviewed under the same standards used to evaluate agency action under the Administrative Procedure Act, 5 U.S.C. § 706. See 28 U.S.C. § 1491(b)(4) (stating that "[i]n any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5"). Thus, to successfully challenge an agency's procurement decision, a plaintiff must show that the agency's decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); see also Bannum, 404 F.3d at 1351.

"The arbitrary and capricious standard" applicable in this case "is highly deferential," and "requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors." Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1058 (Fed. Cir. 2000) (citing Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc., 419 U.S. 281, 285 (1974)); see also Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332–33 (Fed. Cir. 2001) (noting that court's function in a bid protest is limited to "determin[ing] whether 'the contracting agency provided a coherent and reasonable explanation of its exercise of discretion'") (quoting Latecoere Int'l, Inc. v. U.S. Dep't of Navy, 19 F.3d 1342, 1356 (11th Cir. 1994)). As a result, where an agency's action has a reasonable basis, the Court cannot substitute its judgment for that of the agency. See Honeywell, Inc. v. United States, 870 F.2d 644, 648 (Fed. Cir. 1989) (holding that as long as there is "a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion") (quoting M. Steinthal & Co. v. Seamans, 455 F.2d 1289, 1301 (D.C. Cir. 1971)).

Further, the agency is afforded very broad discretion when it determines whether and to what extent an offeror's past performance examples instill confidence that the offeror will successfully perform and meet the needs of the agency on the contract that is the subject of the procurement. See Vanguard Recovery Assistance v. United States, 101 Fed. Cl. 765, 785 (2011) (quoting Al Andalus Gen. Contracts Co. v. United States, 86 Fed. Cl. 252, 264 (2009)) (stating that it is a "'well-recognized' principle that 'an agency's evaluation of past performance is entitled to great deference'"); Seaborn Health Care, Inc. v. United States, 101 Fed. Cl. 42, 51

(2011) (finding that when evaluating an offeror's past performance, "FAR 15.305(a)(2) affords agencies considerable discretion in deciding what data is most relevant"); FirstLine Transp. Sec., Inc. v. United States, 100 Fed. Cl. 359, 396 (2011) (quoting Univ. Research Co. v. United States, 65 Fed. Cl. 500, 505 (2005)) ("When the Court considers a bid protest challenge to a past performance evaluation conducted in the course of a negotiated procurement, 'the greatest deference possible is given to the agency.'"); Todd Constr., L.P. v. United States, 88 Fed. Cl. 235, 247 (2009), aff'd, 656 F.3d 1306 (Fed. Cir. 2011) ("[T]he relative merits of the offerors' past performance is primarily a matter within the contracting agency's discretion.'") (internal citations omitted).

In short, the disappointed offeror in a bid protest "bears a heavy burden" in attempting to show that a procuring agency lacked a rational basis for its decision. Impresa, 238 F.3d at 1338. And "the protestor's burden is greater in [a] negotiated procurement, as here, than in other types of bid protests because 'the contracting officer is entrusted with a relatively high degree of discretion.'" Glenn Defense Marine (ASIA), PTE Ltd. v. United States, 720 F.3d 901, 907 (Fed. Cir. 2013) (quoting Galen Med. Assocs., Inc. v. United States, 369 F.3d 1324, 1330 (Fed. Cir. 2004)); see also Croman Corp. v. United States, 724 F.3d 1357, 1363 (Fed. Cir. 2013); Galen Med. Assocs., 369 F.3d at 1330; Banknote Corp. of Am. Inc. v. United States, 365 F.3d 1345, 1355 (Fed. Cir. 2004); Am. Tel. & Tel. Co. v. United States, 307 F.3d 1374, 1379 (Fed. Cir. 2002); Advanced Data Concepts, 216 F.3d at 1058; E.W. Bliss Co. v. United States, 77 F.3d 445, 449 (Fed. Cir. 1996); Lockheed Missiles & Space Co. v. Bentsen, 4 F.3d 955, 958–59 (Fed. Cir. 1993).

## IV.    Merits

As explained below, the Court finds each of Vectrus' arguments unpersuasive. First, the record reflects that the agency carefully evaluated each offeror's past performance and that Vectrus was not subject to disparate treatment. Further, the Court rejects the argument that work performed in Greenland pursuant to a prior contract was performed at a location "within Europe," and so upholds the agency's conclusion that Vectrus' performance on the prior contract was "Relevant" but not "Very Relevant." AR Tab 39 at 2164. Neither is the Court convinced by Vectrus' challenge to the agency's price-reasonableness determination, which was conducted pursuant to the FAR's preferred methods for comparing prices. Finally, there is no merit to Vectrus' contention that the agency's best-value determination was inconsistent either with the terms of the Solicitation or with law.

### A.    Alleged Disparate Treatment

Vectrus alleges that the Air Force's "[m]ost egregious[]" error was its "disparate treatment of the two offerors with regard to their comparable past performance shortcomings." Pl.'s Sealed Mem. in Supp. of its Mot. for J. on the Admin. R. ("Pl.'s MJAR") at 7, 12, ECF No. 31-1. Specifically, it contends that the agency "focused extensively on [Vectrus'] isolated performance issues" but "ignored the documented deficiencies in KBR's past performance." Id. at 7, 10. In fact, it argues, KBR's record "is replete with adverse past performance more serious than any negative past performance" on the part of Vectrus. Id. at 7.

As the Federal Circuit has explained, to prevail on a disparate treatment claim, a protestor must show either "that the agency unreasonably downgraded its proposal for deficiencies that were 'substantively indistinguishable' or nearly identical [to] those contained in other proposals," Office Design Grp. v. United States, 951 F.3d 1366, 1372 (Fed. Cir. 2020) (quoting Enhanced Veterans Sols., Inc. v. United States, 131 Fed. Cl. 565, 588 (2017)), or that "the agency inconsistently applied objective solicitation requirements between it and other offerors, such as proposal page limits, formatting requirements, or submission deadlines," id. (citing Sci. Applications Int'l Corp. v. United States, 108 Fed. Cl. 235, 272 (2012)). Only if a protester meets one of these thresholds can the reviewing court "comparatively and appropriately analyze the agency's treatment of proposals without interfering with the agency's broad discretion in these matters." Id. at 1373; see also WellPoint Military Care Corp. v. United States, 953 F.3d 1373, 1378 (Fed. Cir. 2020). As explained in Office Design Group, unless the proposals are substantively indistinguishable, the court would be able to exercise "free reign to second-guess the agency's discretionary determinations underlying its technical ratings," which "is not the court's role." 951 F.3d at 1373 (citing E.W. Bliss Co., 77 F.3d at 449).

For the reasons set forth below, Vectrus' disparate treatment argument as well as its contention that the agency should have assigned it a higher performance confidence rating are unavailing. The record reflects that there were numerous substantive differences between the nature and quality of the two offerors' past performance references. Further, the agency provided an adequate explanation for assigning KBR a higher performance confidence assessment rating than it assigned Vectrus, and its conclusion is supported by the record.

### 1.   Alleged Failure to Consider Deficiencies in KBR's Past Performance References

Vectrus contends that there are "documented deficiencies in KBR's past performance" that the SSEB and ultimately the SSA ignored when it rated KBR's "Very Relevant" references—the TSBMC I, Djibouti, and LOGCAP IV contracts—as "Very Good," "Satisfactory," and "Exceptional," respectively. Pl.'s MJAR at 10. The Court is not persuaded. Rather, it agrees with GAO that Vectrus has "cherry-pick[ed] individual instances of negative past performance," and that it "is focusing on isolated incidents in KBR's records that ignored the reality that KBR's performance record on its "Very Relevant" contracts was materially stronger than . . . [Vectrus']." Tab 129 at AR 4838.[1]

For example, the agency rated KBR's performance on TSBMC I (the predecessor to Vectrus' incumbent contract) "Very Relevant" and "Very Good." AR Tab 64 at 2971–72. Vectrus contends that, in so doing, the agency ignored that in the course of contract performance it had issued KBR four Contractor Deficiency Reports related to "Fire and Emergency Services exercise performance, Housing Office TQA calculation, Routine Work Orders, and a Failure to Manage Process." Pl.'s MJAR at 7–8 (quoting AR Tab 25 at 1543). Vectrus further argues that

---

[1] GAO decisions are not binding on the Court but may be treated as persuasive authority in light of GAO's expertise in the bid protest arena. See Allied Tech. Grp., Inc. v. United States, 649 F.3d 1320, 1331 n.1 (Fed. Cir. 2011).

the agency ignored a number of corrective action reports concerning KBR's contract performance in Spain. Id. at 8. These reports were "primarily for excessive customer complaints generated in underlying functional areas, [an] indication of non-compliance with the underlying contractor internal management plan," and "the need for KBR to improve their internal quality control program." Id. (quoting AR Tab 25 at 1544–45).

But there is no reason to believe that the agency "ignored" these or other KBR performance issues simply because it found them unworthy of discussion in the SSEB Report or award decision. Id. at 7. A "Substantial Confidence" rating reflects an agency's "high expectation that the offeror will successfully perform." AR Tab 39 at 2164. Successful performance does not mean problem-free performance. The agency must therefore take into consideration both the positive aspects of an offeror's performance, and "the appropriateness and/or effectiveness of any corrective actions taken (not just planned or promised)" where problems arise. Id. at 2163.

The agency's decision reflects this totality of the circumstances approach. In assessing its confidence in KBR, the agency did not ignore negative aspects of KBR's performance on the predecessor contract. To the contrary, the SSA observed that the evaluators who had prepared the CPARs on KBR's past performance references had "identified KBR's ability to meet contract requirements" but also "when faced with non-conformance," KBR exhibited a "willingness and ability to quickly take corrective action." AR Tab 67 at 3093.

Further, the CPAR itself characterized the deficiency and corrective action reports Vectrus believes were entirely ignored as "exception[s]" to KBR's otherwise satisfactory or "excellent" delivery of "[a]ll contractually required services." AR Tab 25 at 1543–44; see also id. at 1543 (documenting KBR's cost-saving actions, "outstanding performance," "initiative," "excellent support," that the "Civil Engineering reaction was immediate and highly effective . . . with no interruption to essential services"; and that "the contracted implementation team . . . commented that, in their experience, the function demonstrated the best preparation for implementation they had seen to date"); id. at 1544 (observing that KBR had "provided 'Excellent' contingency operations support to over 800 Marines," "responded to contingency needs quickly," maintained "[p]rofessional and positive cooperation between civilian and military personnel result[ing] in a seamless transition," and "provided timely and effective support on all Above and Beyond requirements within the performance period").

Vectrus similarly argues that the SSEB ignored negative comments in the relevant CPAR about KBR's performance on the Djibouti Contract. As Vectrus notes, the CPAR issued for the November 2017 to November 2018 performance period for that contract reflects negative assessments that were characterized as "significant in nature," including one involving "a serious safety concern regarding pedestrian safety during heavy equipment operations," one that "addressed 153 routine service orders that had not been completed with[in] the prescribed 30 calendar days," one based on KBR's failure to comply with an aspect of its quality assurance plan, and several others involving KBR not complying with certain rules requiring it to provide "an Environmental/Energy Manager whose primary duty and responsibility is to ensure Contractor operations adhere to the goals and policies of the Environmental Management

14

System, the Installation Energy Plan, and other specified Sustainability requirements affecting this contract." Pl.'s MJAR at 8–9 (quoting, at length, AR Tab 25 at 1565–66).

But the CPAR reveals—in context—that the evaluators did not consider these issues significant because they still assigned KBR three "Satisfactory" and one "Very Good" rating for this performance period. AR Tab 25 at 1561. Further, the agency evaluator for the prior contract noted that during the period "KBR me[t] all contract requirements for" quality, schedule, regulatory compliance, and management ("and exceed[ed] some to the Government's benefit"). Id. at 1561–62. In fact, the evaluator characterized the performance problems as "minor" ones and also noted "that there were no problems encountered that were not resolved during this reporting period." Id. at 1561.

It also bears noting that the reason that the aforementioned negative assessments appeared in the CPARs at all was because KBR challenged the agency's decision to give it a "Satisfactory" (as opposed to "Very Good") rating for quality and regulatory compliance. See id. at 1563. The challenge prompted the government to offer further explanation by identifying the relatively minor issues that prevented KBR from receiving a higher than satisfactory rating. Id. at 1565–66. Nonetheless, the evaluator concluded that, "[g]iven what I know today about the contractor's ability to perform in accordance with this contract or order's most significant requirements, I would recommend [it] for similar requirements in the future." Id. at 1563.

Similarly unavailing is Vectrus' reliance on a past performance questionnaire ("PPQ") completed for the Djibouti Contract in which the agency evaluator stated that "[m]ost of the negative aspects [of performance] dealt with stem from poor training of unskilled laborers." AR Tab 28 at 1803. This observation was made in response to a question soliciting the "most negative aspects in the performance of the contract." Id. Further, the evaluator explained that KBR had been "responsive to required remedies for individual issues and [met] all contractual training requirements," but that "the available labor pool is a limiting factor." Id. The evaluator further observed that "[KBR] is extremely capable," and that he had "[n]o reservations" in response to a question "about soliciting this contractor in the future or having [KBR] perform one of [our] critical and demanding programs." Id.

Vectrus next points to the agency's alleged failure to address performance issues in KBR's third "Very Relevant" reference, the LOGCAP IV contract, for which its performance was rated "Exceptional." Pl.'s MJAR. at 9. It observes that KBR received four non-conformance reports during the first year of a five-year performance period. But again, these performance issues have been wrenched out of their context. The CPAR rated the "Overall Quality" of KBR's performance on the task order "Very Good" and rated as "Exceptional" its "Schedule," "Cost Control," and "Management" in performing on the order. AR Tab 25 at 1568; see also id. at 1570 (noting that management had been "Excellent," and observing that KBR's "flexibility and responsiveness to the changing requirements ha[d] allowed all missions to be completed successfully" and "allow[ed] for a smooth transition[] into a fully operational mission").

The Court is similarly unpersuaded by Vectrus' observation that "[t]he Air Force also collected one PPQ, which noted cost control issues for KBR." Pl.'s MJAR at 9. Vectrus neglects to note that the agency identified "cost control issues" in response to a question regarding the

"most negative aspect[] in the performance of the [LOGCAP IV Contract]." AR Tab 28 at 1793. More importantly, it fails to mention that the PPQ emphasized that "this is NOT a significant concern" because KBR was projecting only a minor overrun, had been transparent about it, and understood that it would not be fee-bearing even if, in fact, the overrun came to fruition. Id.

Finally, Vectrus cites an excerpt from the CPAR for KBR's Isa Air Base contract, which states that "[a]t the beginning of the contract, preventive maintenance was difficult to follow-up on with regards to Government performance assessment." Pl.'s MJAR at 10 (quoting AR Tab 25 at 1550). The CPAR narrative, however, reflects that, after the government notified KBR of this concern, it implemented satisfactory corrective actions to address it. AR Tab 25 at 1550–51.

In short, Vectrus' citation of isolated examples of KBR performance deficiencies is unavailing. The Solicitation states that the agency would consider, not only "the number and severity" of an offeror's performance problems but also "the appropriateness and/or effectiveness of any corrective actions taken . . . and the overall work record." AR Tab 39 at 2163. Both the SSEB and the SSA faithfully applied this standard. They "did not find any adverse past performance for KBR," because previous reviewers and evaluators had identified KBR's "ability to meet contract requirements and, when faced with non-conformance, willingness and ability to quickly take corrective action." AR Tab 67 at 3093 (noting "multiple instances where KBR's performance deficiencies were highlighted and KBR's corrective action was taken at no risk to the Government").

### 2. Alleged Exaggeration of Concerns About Vectrus' Past Performance

In addition to arguing (unpersuasively) that the agency "ignored the documented deficiencies in KBR's past performance," Vectrus also contends that the agency "took the exact opposite approach with Vectrus." Pl.'s MJAR at 10. This allegation of unequal treatment is not supported by the record.

First, Vectrus argues, "both the SSEB and the SSA exaggerated the significance of adverse past performance that was the subject of two [ENs] issued to Vectrus under the incumbent contract." Id. As to the first EN, Vectrus challenges the agency's conclusion that its failure to perform requirements regarding the maintenance of aircraft arresting barriers under the incumbent contract caused a "waste of Government resources and risk of mission failure due to improper maintenance of the AAS by contractor personnel." Id. (quoting AR Tab 64 at 2990–91). It notes that its failure resulted in only "a grand total of $17,800 in added costs – which Vectrus paid in full." Id. It also contends that the safety concerns related to the aircraft barrier issue were "not materially different" (and in fact "facially quite similar," Pl.'s Sealed Reply & Resp. in Supp. of its MJAR ("Pl.'s Resp. & Reply") at 8, ECF No. 37) to "KBR's failures under its Djibouti base operations support contract to ensure pedestrian safety during heavy equipment operations," Pl.'s MJAR at 12.

These contentions lack merit. First, it is clear from the record that the Air Force's primary concern was not the added monetary costs. Its primary concern was with Vectrus' inability to ensure that the aircraft arresting barriers were operational at all times, which it concluded put "the mission, aircraft, and personnel at risk." AR Tab 27 at 1777. Further, the agency's reference

to a "waste of Government resources," AR Tab 64 at 2989, was not solely about the $17,800 in added costs; it also referred to the waste of manpower that resulted when the agency had to deploy a specialized team from Germany because Vectrus was unable to perform the necessary repairs on the barriers itself, AR Tab 27 at 1777 (noting that the government had to expend "funds and manpower . . . to complete . . . [r]epairs that [Vectrus] was responsible to perform"). Vectrus itself viewed this issue as sufficiently serious to cause it to replace the Program Manager. See AR Tab 35 at 1995 (noting the assignment of a new TSBMC II Program Manager "to ensure operations are in compliance with contract and regulation requirements").

Further, Vectrus has not shown that the safety concerns arising out of its failures of performance as to the arresting barriers are "substantively indistinguishable" from the pedestrian safety issues that arose during heavy equipment operations during KBR's performance on the Djibouti Contract. Office Design Grp., 951 F.3d at 1372. The Court therefore has no basis for holding that the agency engaged in disparate treatment when it treated the safety issues raised with respect to the former as more worthy of concern and discussion than those with respect to the latter.

The second EN whose importance Vectrus contends the agency overstated concerned Vectrus' noncompliance with a database updating requirement on the incumbent contract. Pl.'s MJAR at 13–15. According to the agency, this failure, which existed over the life of the contract, resulted in "the Government's not having oversight of civil engineering project management [causing] the Government [to be unable to] track costs, schedules, milestones, and program for funds." AR Tab 64 at 2990–91; see also AR Tab 67 at 3090 (SSAC's award recommendation noting the same). Vectrus characterizes the failure as "a minor error that did not have any impact on the mission." Pl.'s MJAR at 10–11. Further, it claims, the database issue was "no different than KBR's status reporting failures under the LOGCAP IV Contract," because, in each instance, the failure "inhibited the Government's oversight ability." Id. at 12.

These contentions are also unpersuasive. While the agency faulted KBR for "incorrect status reporting" during the first year of the Djibouti Contract, the contractor ultimately received a "Very Good" quality rating in the CPAR covering that same period. AR Tab 25 at 1568. By contrast, Vectrus personnel failed to update the TSBMC II Project Management Database during four full years of contract performance.

Vectrus further contends that the issues raised in the two ENs "reflected isolated incidents under a contract that Vectrus has otherwise performed quite well," and it cites a number of passages from the CPARs on the incumbent contract that include praise of various aspects of its performance. Pl.'s MJAR at 11–12. But the Air Force acknowledged positive aspects of Vectrus' performance on the incumbent contract, observing that "Vectrus took noteworthy actions to fulfill mission requirements during rapid contingency operations involving multiple countries and cultures needing support." AR Tab 64 at 2991. It also assigned a "Satisfactory" performance confidence rating to Vectrus' proposal reflecting its reasonable expectation that Vectrus would successfully perform on a new contract. Id.

Ultimately, however, the Air Force viewed Vectrus' "complete past performance record" as weaker than KBR's—particularly in light of the performance history of the offerors'

17

respective "Very Relevant" references. Compare AR Tab 31 at 1856 (demonstrating exclusively "Very Good" and "Exceptional" ratings in the CPARs of KBR's "Very Relevant" references), with id. at 1857–58 (demonstrating mostly "Satisfactory" ratings in the CPARs for TSBMC II, Vectrus' only "Very Relevant" reference).

Moreover, the agency also took into consideration that—as of the time that the SSEB conducted its evaluation—Vectrus had not yet completed the corrective actions proposed in response to the ENs. AR Tab 64 at 2993. The SSEB observed that Vectrus' failure was "concerning" as it showed that Vectrus was "unable to follow-through on proposed corrective actions thus negatively impacting mission capability." Id.

Vectrus also contends that "the SSEB unfairly elevated two minor past performance infractions under the incumbent contract . . . for the SSA's specific consideration in the best value tradeoff," notwithstanding that they had been resolved. Pl.'s MJAR at 13. But while the SSA understood that the cited management and invoicing concerns had been "addressed or resolved," he did not view them as minor issues. AR Tab 67 at 3093; see also AR Tab 64 at 2992 (SSEB Report highlighting issues with Vectrus' performance as documented in the TSBMC II CPARs). To the contrary, he stated that "[t]hese documented issues with invoicing and manning cause significant concern for the Government in respect to [Vectrus'] ability to responsibly manage Government funds." AR Tab 64 at 2992. He explained that "the information in the CPARs emphasizes that Vectrus "regularly fails to provide complete and accurate invoices, proposals, and overall program cost data" and that "documented performance issues in cost control and management point to ineffective internal processes and is not conducive to the proper and successful performance of a [base operations support] contract." Id.

Finally, the Court notes that the record supports the agency's conclusion that KBR's past performance record was better overall than Vectrus'. Vectrus' CPARs show that more than half of the ratings it received over multiple rating periods were merely "Satisfactory." AR Tab 31 at 1857–58. On the other hand, the majority of the ratings KBR received included a mix of "Exceptional" and "Very Good" ratings. Id. at 1856. For this reason, as well as those set forth above, Vectrus' disparate treatment argument lacks merit.

### B.     The Relevancy Rating Assigned to Vectrus' Thule Contract

Vectrus next claims that the Air Force misinterpreted the Solicitation's terms when it classified the Thule Contract as a merely "Relevant" reference, rather than a "Very Relevant" one. Pl.'s MJAR at 17. Resolution of this protest grounds depends upon an interpretation of the language of the Solicitation defining "Very Relevant" references as those which, among other things, involved performance "in multiple locations simultaneously within Europe or Africa." AR Tab 39 at 2164.

When interpreting a solicitation, the Court applies the same principles that apply to the interpretation of contracts. Banknote Corp., 365 F.3d at 1353 n.4; see also Linc Gov't Servs., LLC v. United States, 96 Fed. Cl. 672, 708 (2010) (citing Banknote Corp., 365 F.3d at 1353) (explaining that "well-settled principles of contract interpretation . . . apply with equal force to the interpretation of government solicitations"). The Court therefore "begin[s] with the plain

language of the document." <u>Banknote Corp.</u>, 365 F.3d at 1353 (citing <u>Coast Fed. Bank, FSB v. United States</u>, 323 F.3d 1035, 1038 (Fed. Cir. 2003) (en banc)). "If the provisions of the solicitation are clear and unambiguous, they must be given their plain and ordinary meaning." <u>Id.</u>; <u>see also</u> <u>Sea-Land Serv., Inc. v. United States</u>, 553 F.2d 651, 658 (Ct. Cl. 1977).

The Solicitation, as noted, requires that performance on "Very Relevant" contracts take place "in multiple locations simultaneously within Europe or Africa." AR Tab 39 at 2164. The Thule Contract, however, was performed almost entirely in Greenland. AR Tab 22 at 1506. There is no dispute that Greenland is located in the continent of North America, not Europe. Because Greenland is not a "location" that is within the continent of Europe, the Thule Contract does not fall within the plain language of the Solicitation's definition of a "Very Relevant" reference. AR Tab 39 at 2164.

Vectrus argues nonetheless that treating Greenland as something other than a location that is within Europe creates anomalies and is inconsistent with "how the Department of Defense actually operates, or basic geo-political realities." Pl.'s MJAR at 20. For example, Vectrus observes, the UABOS Contract involves the performance of services in Turkey, a country which lies "almost entirely in the continent of Asia." Pl.'s MJAR at 19. It would be "inexplicabl[e]" for the Air Force to "require[] past performance in Europe and Africa," Vectrus argues, "when a substantial portion of performance will occur in the physical location of Asia." <u>Id.</u> Therefore, it contends, the phrase "within Europe and Africa" must be based on something other than geographic location. <u>Id.</u> at 18–19. And what that something is, according to Vectrus, is whether, like Turkey, the location is within United States European Command's ("EUCOM") Area of Responsibility ("AOR"). Pl.'s MJAR at 19. Greenland is not only within EUCOM's AOR, Vectrus explains, but has also "been politically and culturally associated with Europe for about a millennium," "is part of the European Union's Overseas Countries and Territories, with Greenlandic citizens having European Union citizenship," and is a province of Denmark (undisputedly a European country), which controls its foreign policy and defense spending. Pl.'s MJAR at 19–20.

Vectrus' interpretation of the Solicitation cannot be squared with its plain language. If the agency had intended to base the "Very Relevant" rating on whether work was performed at multiple locations within EUCOM's AOR, or at multiple locations within nations that have a political or cultural association with Europe, then it could have said so explicitly. Moreover, if Vectrus' interpretation were applied, then the agency would have been required to consider work performed in, among other places, the British Virgin Islands, New Zealand, or Australia—all countries with geopolitical ties to Europe. This is simply not a reasonable reading of Solicitation language that references work performed at <u>locations</u> that are <u>within</u> Europe. AR Tab 5 at 192.

## C.    <u>The Agency's Price Evaluation</u>

"The purpose of a price reasonableness analysis is to prevent the Government from paying too high a price for a contract." <u>See, e.g.</u>, <u>Patriot Taxiway Indus., Inc. v. United States</u>, 98 Fed. Cl. 575, 587 (2011) (citing <u>Ceres Env't Servs. v. United States</u>, 97 Fed. Cl. 277, 303 n.15 (2011)). Vectrus contends that the agency's price evaluation was flawed in several respects and

that it should have found KBR's TEP unreasonably high and eliminated KBR from the competition. Pl.'s MJAR at 22–27. These contentions lack merit.

Agencies have significant discretion under the FAR to choose the appropriate technique for conducting their price reasonableness analyses. See FAR 15.404-1(b)(2); see also Serco Inc. v. United States, 81 Fed. Cl. 463, 495 (2008) ("[T]he depth of an agency's price reasonableness analysis and its ultimate findings on that count are both matters of discretion."). Here, the Solicitation provided that the agency would conduct its price analysis "with the expectation of adequate price competition." AR Tab 32 at 1886. It also stated that it would "rely on the techniques and procedures described under FAR 15.404-1(b) as the primary means of assessing proposal reasonableness." AR Tab 38 at 2091.

FAR 15.404-1(b) sets forth two "preferred" techniques for determining price reasonableness. See FAR 15.404-1(b)(3). In this case, the agency employed both preferred techniques and came to the reasonable conclusion that KBR's price was not too high to pay in light of what the agency viewed as its superior proposal.

First, the agency employed the preferred technique set forth at FAR 15.404-1(b)(2)(i), which endorses the "[c]omparison of proposed prices received in response to the solicitation," because "[n]ormally, adequate price competition establishes a fair and reasonable price." The agency compared the three offerors' proposed TEPs to one another by using their average as a benchmark against which to determine price reasonableness. AR Tab 64 at 2953.

Vectrus challenges the agency's use of this FAR-preferred technique on the ground that, as the incumbent contractor, only it possessed the actual "incumbent employee tenure data required to provide precise pricing." Pl.'s MJAR at 27. Because they lacked access to this data, according to Vectrus, KBR and the third competitor (Dynacorp) inflated their prices to account for risk, thereby skewing the average TEP upwards.

In effect, Vectrus is arguing that it was unreasonable for the agency not to use incumbent pricing as the benchmark for its price reasonableness determination. But the Solicitation stated that, "[f]or a price to be reasonable, it shall represent a price to the Government that a prudent person would pay when consideration is given to prices in the market." AR Tab 39 at 2165. The prices of all technically acceptable offerors provide a reliable indication of what the current market prices are for the services to be delivered, even if they are higher than the actual prices charged by the incumbent contractor.

There is similarly no merit to Vectrus' related argument that the agency "unreasonably ignored KBR's overly conservative employee tenure estimates" and that, as a result, the agency found reasonable a proposal whose labor costs were too high. Pl.'s MJAR at 22–24. Verifying the fairness of the overall price is the purpose of the price analysis. See FAR 15.404-1(a)(3). The Solicitation therefore required the Air Force to assess whether each TEP was, as a whole, reasonable; it did not require the agency to examine costs on a line-by-line basis. AR Tab 39 at 2164–65. Indeed, FAR 15.404-1(b)(1) defines "[p]rice analysis" as "the process of examining and evaluating a proposed price without evaluating its separate cost elements and proposed profit."

20

Moreover, the agency did not ignore KBR's tenure estimates. AR Tab 58 at 2561. It reviewed them and concluded that, although higher than Vectrus', they were not unreasonable. It explained that they were higher because KBR, unlike Vectrus, lacked access to accurate labor cost data. Id. at 2561–66. Nonetheless, the agency determined that KBR's estimates and Vectrus' were not so far apart as to render KBR's TEP unreasonable. See id. at 2565 (noting that "no seniority list was provided by the Government" for Spanish or Turkish labor under the current contract, prompting KBR to assume "an average seniority of [* * *] years for pricing Spanish labor" and "an average seniority of [* * *] years for pricing Turkish labor"). Vectrus' arguments based on employee tenure rates are therefore unavailing.

Vectrus further argues that the TEP the government constructed—which was based on the consideration of historical prices (the second FAR-preferred technique, see FAR 15.404-1(b)(2)(ii))—was objectively unreasonable and that the agency "unreasonably refused to reconsider its flawed estimate" when Vectrus pointed out the alleged errors in its analysis. Pl.'s MJAR at 24–26; see also Pl.'s Resp. & Reply at 17–18 (stating that the "primary thrust" of Vectrus' allegation is that, when it confronted the Air Force "with facts demonstrating that the Government TEP was predicated on flawed assumptions and data," the agency "simply put its head in the sand and forged onward with the evaluation, rather than meaningfully considering whether the Government TEP was a fair and reasonable estimate of the anticipated cost of performance"). This argument, too, lacks merit.

The first alleged error occurred, according to Vectrus, when the government used the current workload and number of Full-Time Equivalent employees under the incumbent contract to calculate its TEP, instead of calculating it on the basis of the anticipated lesser workload under the UABOS Contract. Pl.'s MJAR at 25–26 (citing AR Tab 36 at 2032). Vectrus' disagreement with the agency's use of historical data is unavailing. "Comparison of the proposed prices to historical prices paid, whether by the Government or other than the Government, for the same or similar items" is, as noted, a method of price analysis explicitly preferred by the FAR and incorporated into the Solicitation. FAR 15.404-1(b)(2)(ii). Further, the agency "recognize[d] variances in workload between TSBMC II and UABOS," but because "as the predecessor to UABOS, TSBMC II is considered a same or similar effort," the agency reasonably chose to use historical labor cost data as is authorized by the FAR. AR Tab 36 at 2037.

Second, Vectrus alleges that "the Government TEP did not account for the actual labor rates mandated by the [Collective Bargaining Agreement in Spain and the Collective Labor Agreement in Turkey]," i.e., that the agency did not develop an annual per person labor cost based on the labor rates determined by the countries' respective collective bargaining agreements, and instead generated a total labor cost estimate for this price component. Pl.'s MJAR at 25 (citing AR Tab 36 at 2032). Vectrus' argument misses the mark. As noted, the Solicitation required the agency to assess reasonableness at the TEP level. See AR Tab 39 at 2165; AR Tab 36 at 2037. The agency has broad discretion in deciding how it will calculate its own estimated TEP. See MED Trends, Inc. v. United States, 102 Fed. Cl. 1, 7 (2011) (finding reasonable the agency's use of an independent government cost estimate that was developed using historical cost information). And it was not unreasonable for the agency to develop its TEP

at a high level, by using an average of five months of labor cost data across all categories. AR Tab 58 at 2575.

Vectrus' objections to the agency's method for determining the average labor costs are also without merit. It contends that the five-month period the agency used resulted in inflated estimated annual labor rates because it included one-time lump-sum payments Vectrus had made to Spanish nationals under the incumbent contract. Pl.'s MJAR at 25 (citing AR Tab 36 at 2032). But the agency chose to utilize a five-month period so that it could account for such fluctuations. See AR Tab 42 at 2179 (Vectrus' representative's comment that "certain months . . . carry bonuses and then either for Spain or Turkey that drastically changed the annual average," and contracting officer's response stating that this is precisely why the Air Force "didn't utilize one specific month," explaining that "utilizing multiple months allows us to see that change over time").

Fourth, Vectrus argues that, based on its "experience performing the same/similar services on TSBMC II," AR Tab 36 at 2034, the Air Force erred in using historical data from that contract to estimate meal costs for the UABOS Contract, Pl.'s MJAR at 25–26 (citing AR Tab 36 at 2032). It claims that the agency's assumption that 89,500 meals will be served per month at two locations was unreasonable, that only 37,152 will be served per month at one location, not two, and that the government's estimated TEP is too high by $18 million. Id. Vectrus does not explain the basis for its projections but—in any event—the agency's approach was to rely upon historical data to calculate the TEP, as it is expressly authorized to do. Vectrus' mere disagreement with the agency's technique and conclusions does not supply valid grounds for protest.

### D.   The Agency's Best-Value Tradeoff

Vectrus' final argument is that the Air Force's best-value tradeoff decision was "fundamentally flawed" because it was based on an alleged misevaluation of the offerors' past performance records and nonadherence to the terms of the Solicitation. Pl.'s MJAR at 28. It contends that the agency "arbitrarily minimized [its] considerable price advantage," and opines that it is "inconceivable that a prudent person would pay 15% more for nearly identical services." Id. at 28–29.

But the agency did not view the services KBR proposed to provide as "nearly identical" to those Vectrus proposed. Office Design Grp., 951 F.3d at 1372. The Court has already rejected Vectrus' arguments that the agency did not properly evaluate and compare the offerors' past performance records and that its price analysis was unreasonable. Vectrus' further argument that it was unreasonable for the agency to agree to pay 15% more for what it calls "nearly identical services" is derivative of its other unpersuasive arguments. Pl.'s MJAR at 29.

Finally, the Court notes that "a best-value determination should not be disturbed so long as the agency documents its final award decision and includes a reason for any business judgments and tradeoffs made." Vertex AeroSpace, LLC v. United States, 142 Fed. Cl. 755, 776 (2019) (citing Blackwater Lodge & Training Ctr. v. United States, 86 Fed. Cl. 488, 514 (2009)). Here, the SSA thoroughly explained the basis for the award decision. The explanations she

provided for finding that KBR's proposal was a better value were reasonable and supported by the record. Her reasoning was also consistent with the Solicitation, which provided that past performance would be considered "significantly more important" than price in making the award decision. AR Tab 39 at 2162. Vectrus' challenge to the best-value tradeoff accordingly lacks merit and does not provide a basis for disturbing the agency's award decision.

## CONCLUSION

On the basis of the foregoing, the Court has denied Vectrus' motion for judgment on the administrative record, ECF No. 31, and granted the government's and intervenor's cross-motions, ECF Nos. 35 & 36. ECF No. 53. Pursuant to the Court's direction in the April 12, 2021 order, judgment was entered accordingly.

**IT IS SO ORDERED.**

s/ Elaine D. Kaplan
ELAINE D. KAPLAN
Chief Judge